## UNITED STATES of America

v.

**Hassan Abdul Kader MAKTABI, a/k/a "Abu Abdo," a/k/a "Abu Abdu," Rabiha Kabakibo and Hassan Said Maktabi, Defendants.**

No. 84 Cr. 1034.

United States District Court, S.D. New York.

Jan. 17, 1985.

Howard Mulholland, New York City, for defendant Kabakibo.

Francis J. Murray, Murray & Skoff, New York City, for defendant Maktabi II.

William J. Kelleher, Kelleher & Stillwaggon, New York City, for defendant Maktabi I.

James R. DeVita, Asst. U.S. Atty., New York City, for the Government.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

The three captioned defendants move pursuant to the Bail Reform Act of 1984 for revocation or amendment of a magistrate's detention order. 18 U.S.C. § 3145(b). The three movants are two men, Hassan Abdul Kader Maktabi and Hassan Said Maktabi; and a woman, Rabiha Kabakibo. They are presently detained pursuant to an order promulgated by Magistrate Bernikow pursuant to 18 U.S.C. § 3142(e). Their motions come before me as Part I Judge.

### I.

The procedural history of the case is not entirely clear. On December 18, 1984, defendants were arrested by Drug Enforcement Administration agents without warrant. They were first brought before Magistrate Dolinger. Magistrate Dolinger was confronted by a complaint sworn out by DEA special agent Richard Musso on December 19, 1984 (the "Musso complaint"). That complaint attached and incorporated by reference a much longer complaint that was sworn out by DEA special agent John Ozaluk on December 15, 1984 (the "Ozaluk complaint"). The Ozaluk complaint listed eighteen defendants, the first one being one Sami Annabi. It is the government's contention, expressed in the Musso and Ozaluk complaints, that the present defendants were participants in a significant heroin distribution conspiracy also involving Annabi and the other individuals listed in the Ozaluk complaint.

The motion was argued before me on December 27, 1984. At that time these defendants had not been indicted. However, on December 28 a grand jury of this district handed up an indictment charging these defendants, Annabi, and others, with, *inter alia*, narcotics conspiracy and substantive offenses.

On the argument before me, counsel for the parties differed as to what occurred or did not occur during defendants' initial appearance before Magistrate Dolinger. It is common ground that the government sought a detention order, while counsel for the defendants sought to avoid detention; and that at the end of the hearing before Magistrate Dolinger, the defendants were in fact detained. Defendants' counsel now argue that Magistrate Dolinger did nothing more than bind the defendants over for a detention hearing to be held at a later date pursuant to section 3142(f). Specifically, defendants' counsel contend that Magistrate Dolinger made no finding as to whether or not there was "probable cause

to believe" that the defendants had committed one of the offenses specified in section 3142(e), whose pertinent provisions appear in the margin.[1]

The government takes a different view of what occurred before Magistrate Dolinger. The government argues that, in effect, defendants moved to dismiss the complaint against them during the initial proceedings before Magistrate Dolinger; and that, in the ordinary course of magistrate's practice, the proceedings before Magistrate Dolinger should be regarded, at least implicitly, as including a determination by him of probable cause sufficient to bind the defendants over for further proceedings.

Several days later the case came on before Magistrate Bernikow. The parties agree that the proceedings before Magistrate Bernikow constituted a "detention hearing" within the contemplation of section 3142(f). But counsel profess to differ in their anticipations of what would occur at the hearing. Defendants, consistent with their perception that Magistrate Dolinger had made no finding of probable cause, argue that they expected the government to offer proof to Magistrate Bernikow in an effort to persuade him that such probable cause existed so as to trigger the rebuttable presumption contained in subsection (e). The government, true to its perception that Magistrate Dolinger had already made a finding of probable cause, professes the expectation that before Magistrate Bernikow, the defendants would undertake to rebut the subsection (e) presumption. In the event, no one offered proof to Magistrate Bernikow, except for the Musso and Ozaluk complaints, which the government brandished before Magistrate Bernikow as it had done before Magistrate Dolinger. The Musso complaint had now been supplemented by a one-page rider which Agent Musso swore to on December 20.

Counsel argued the case for and against continued detention before Magistrate Bernikow. It appears from the transcript of Magistrate Bernikow's ruling that, in his mind at least, his brother Magistrate Dolinger had previously made a probable cause determination. Magistrate Bernikow said:

> Gentlemen, the bottom line is simply this: I agree the evidence against these defendants is extremely weak, but a determination has been made by a magistrate last week that there was sufficient cause to hold them certainly for a detention hearing. Therefore, I can't look behind that.
>
> What I would have done if the same application was made to me I can't tell you at this time. I do agree the case is extremely weak against these defendants. Nonetheless it seems to me that I also—and if there is any basis that these defendants have any ties to this community I think I would be hard pressed to find that they should be detained. But from what I have been able to discern from your comments, these people came here from Syria within the last month, have no roots here, and they would be an extremely poor risk. (Tr. at 1)

Magistrate Bernikow went on to continue the defendants in detention on the ground that "their total lack of roots in this community" made them an unacceptable bail risk. *Ibid.*

---

1. The statute provides in part:

   "If, after a hearing pursuant to the provisions of subsection (f), the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, he shall order the detention of the person prior to trial...."

   \*   \*   \*   \*   \*   \*

   "Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.C.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), section 1 of the Act of September 15, 1980 (21 U.S.C. 955a), or an offense under section 924(c) of title 18 of the United States Code."

I construe Magistrate Bernikow's holding to be that, since Magistrate Dolinger had made a finding of probable cause of these defendants' participation in a drug conspiracy, they bore the subsection (e) burden of rebutting the presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community ..." Because defendants could demonstrate no roots in the community, they failed to rebut the first of the two adverse statutory presumptions, so that the detention order was required to be continued.

Again consistent with their perception that Magistrate Dolinger had made no probable cause determination, defendants argued before me that Magistrate Bernikow should not have felt himself inhibited by the proceedings before Magistrate Dolinger, but rather should have made his own independent evaluation, a concept appealing to the defendants because of Magistrate Bernikow's expressed view (which the government made clear that it does not accept) that the case was "extremely weak" against these defendants. Defendants contend that the proceedings before Magistrate Bernikow resulting in their continued detention are fatally flawed because Magistrate Bernikow did not make that independent evaluation. In any event, defendants argue, the complaints in the case do not establish probable cause.

As noted, the government contends that Magistrate Dolinger made a finding of probable cause; that Magistrate Bernikow properly deferred to it in what should be regarded as a "divided detention hearing"; and that probable cause as to these defendants arises from the Musso and Ozaluk complaints.

At the end of oral argument, it seemed to me to be useful to attempt to obtain a record of the initial proceedings before Magistrate Dolinger. But those proceedings were not transcribed by a court stenographer. The record consists of tapes embracing all proceedings before Magistrate Dolinger that day. I have been given the tapes but they are not intelligible on any equipment immediately available to me. I am told that special equipment available only in the Magistrate's Court may be of assistance. But I have decided not to delay further the proceedings involving these three detained individuals.

Assuming the record of the proceedings before Magistrate Dolinger confirmed defendants' perception, the conclusion would be that neither Magistrate Dolinger nor Magistrate Bernikow made an independent evaluation of probable cause. I could, in those circumstances, remand the matter to the magistrates for further proceedings; but that would further burden them in their efforts to keep current with the litigation engendered by this new statute, and serve further to postpone the defendants' review of their actions in this Court. On the other hand, if the government's perception of the prior proceedings is correct, the defendants are entitled to be in this Court on a motion for revocation or amendment of the detention order pursuant to section 3145(b).

In these circumstances, I have decided to consider the question of probable cause *de novo*. In view of the procedural uncertainties, I need not decide whether a magistrate's detention order is ordinarily entitled to a degree of deference in the district court.

This brings me to a consideration of the Musso and Ozaluk complaints; and to supplementary material which the government has furnished since the motion was argued in Part I. That material consists of the indictment subsequently returned, which includes these defendants; and the results of a search conducted on January 2, 1985, pursuant to warrant, of a briefcase and a suitcase handled by defendant Hassan Abdul Kader Maktabi under the circumstances described below.

## II.

While the government does not make the argument explicitly, the question arises whether the post-motion indictment of these defendants in effect moots the mo-

tion by establishing subsection (e) probable cause. If it does, defendants' motion must fail, for they have done nothing to rebut the two-pronged presumption triggered by the probable cause.

■ No reported cases have construed this recently enacted statute on this point. But I decline to hold that a grand jury indictment automatically forecloses a defendant's right to challenge a detention order before a magistrate or a district judge. Those judicial officers are obligated, as I read the statute, to make an independent evaluation of whether or not the accused should be detained. They do so on the basis of the proof made or proffered by the government or the defendant at the detention hearing. That may be different in quantity and in kind from the proof submitted to the grand jury. It follows that, hypothetically at least, evidence submitted to the judicial officer may be insufficient to justify detention of a defendant, although the grand jury had sufficient evidence to indict. The proceedings are separate; and the question of legal sufficiency arises at different times. That is to say: the sufficiency of evidence to justify pre-trial detention must be considered at once, while under familiar principles the legal sufficiency of evidence underlying a facially well-founded indictment may not ordinarily be given pre-trial consideration.

Accordingly I resolve the present motions on the basis of an independent evaluation of the evidence before me.

### III.

The 65-page Ozaluk complaint clearly demonstrates probable cause to believe that Annabi and his associates were actively engaged in a major heroin importation and distribution operation in the greater New York City area. The complaint is based primarily upon personal surveillance and surveillance and recording of telephone calls, the latter pursuant to warrant. It is unnecessary to recite the details of this surveillance. It suffices for present purposes to say that the Ozaluk complaint furnished adequate basis for inferring that,

over the course of at least several months, Annabi was devoting himself with single-minded energy to heroin importation and distribution; and that a number of confederates identified in the Ozaluk complaint (which does not embrace the present movants) were associated with him in that enterprise.

It is worth noting, however, that the electronic surveillance indicates that Annabi was in frequent contact by telephone with individuals in the Middle East; primarily Lebanon and Syria. While the monitored telephone conversations almost invariably made use of code words and phrases, the DEA agents were entitled to infer that the Middle East was a significant source of heroin for Annabi's operation, the substance being brought into the greater New York area by couriers travelling by air.

This geographical factor, when taken together with Annabi's absorption with heroin importation and distribution during the pertinent months, forms the totality of the circumstances in which the evidence concerning the present movants must be evaluated. I emphasize the circumstances relating to Annabi because in their light, relatively limited or seemingly innocent contacts between the present movants and Annabi or Annabi's confederates may very well take on different and more revealing dimensions.

I come now to the three movants. It appears from the Musso complaint that on December 9, 1984, Hassan Abdul Kader Maktabi (hereinafter "Maktabi I") and Hassan Said Maktabi (hereinafter "Maktabi II") entered the United States through JFK Airport on a Swissair flight. While the Musso complaint does not recite where the flight came from, it is common ground that the Maktabis, as well as Ms. Kabakibo, are Syrians. On arrival at JFK Maktabi I gave his address in the United States as 305 West 13th Street, Manhattan. Maktabi II gave his address as "85th and Broadway Street," also in Manhattan. A restaurant called "Sultan's Table" is located at 2337 Broadway, which is 85th Street and Broad-

way. Surveillance indicated that the manager of the Sultan's Table was one Mamdouh Cheit, who had been observed opening and closing the restaurant. New York Police Department records identified Cheit's brother as the owner of the Sultan's Table; the brother is currently a fugitive on federal narcotics charges.

When Maktabi I was arrested on December 18, he gave his local address as the Sultan's Table restaurant.

Surveillance of telephone calls and of Annabi's movements beginning on or about December 12 indicated to the DEA agents that Annabi was amassing a large amount of cash. The agents drew the inference that Annabi needed the cash to engage in a narcotics transaction.

On December 15, a Saturday, Maktabi I telephoned Annabi and they arranged to meet at a Holiday Inn in Yonkers. Agents observed Maktabi I arriving at the Holiday Inn by cab. The cab driver, interrogated, stated that he had picked Maktabi I up at 82nd Street and Broadway, three blocks south of the Sultan's Table restaurant.

Annabi and Maktabi I met at the Holiday Inn, and then went to a diner in Yonkers, where they encountered Jorge Luis Audinot, a/k/a "Papo," who is identified by the surveillance described in the Ozaluk complaint as a consistent narcotics customer of Annabi's. Papo was accompanied by an unidentified woman.

These four individuals eventually left the diner in the same vehicle. Papo and the female left the vehicle shortly thereafter and picked up a cab. Annabi and Maktabi I continued to 51 Linden Street, Annabi's residence, and entered. Maktabi I called the Sultan's Table restaurant from Annabi's home and indicated that he would call back there. Mamdouh Cheit was observed answering the telephone at the restaurant at the time this call was made.

Thereafter Annabi and Maktabi I were observed leaving 51 Linden Street. Surveillance was lost intermittently; but they were eventually observed again in a parking lot near the Yonkers Raceway. Anna-

bi's son was observed taking two white boxes out of the Annabi car and placing them into a taxi. Maktabi I was observed placing his briefcase and a brown box into the taxi. Maktabi I then proceeded by taxi to the Sultan's Table restaurant, and brought the briefcase and the boxes into the restaurant.

Maktabi I and Maktabi II were then observed proceeding to the Bretton Hall Hotel at 2350 Broadway, Ms. Kabakibo, who was later observed together with Maktabi I in circumstances to be related, was subsequently discovered to be registered in Room 740 of that hotel.

Maktabi I and Maktabi II were then observed returning from the Bretton Hall Hotel to the Sultan's Table. Maktabi II was seen taking two suitcases to the Esplanade Hotel at 305 West End Avenue, thereafter returning to the Sultan's Table. Maktabi I and Maktabi II stayed at the Sultan's Table until closing time, about 1:30 a.m. on Sunday, December 16, and then accompanied two other unidentified individuals to a nightclub, finally returning to the Esplanade Hotel.

Subsequent investigation revealed that Room 5C at the Esplanade Hotel was registered to Mamdouh Cheit. On December 18, in connection with the arrests of certain suspects at the Sultan's Table, the agents obtained a statement from a waitress to the effect that "one of the Syrians" (not further identified) had left the two suitcases which Maktabi II had taken from the restaurant to the Esplanade in Room 5C.

On Sunday, December 16, the agents overheard a telephone call Annabi received from a male identified as "Abu Louz," who told Annabi that Maktabi I "didn't have anything and to be careful."

On Monday, December 17, Maktabi I and another male were observed going to a bank on the upper westside of Manhattan, to change what appeared to be a large quantity of United States currency into cashier's checks. Later that afternoon, Maktabi I, a male later identified as Zuhair Katerji (who together with Cheit is included in the recent indictment), and Ms. Ka-

bakibo, were observed travelling together in the same car to about four other banks, to engage in similar transactions. On at least one occasion, Kabakibo was observed standing in line at a bank, with Katerji in another line at the same bank. When Kabakibo was arrested, a slip of paper was found with a note which directed the teller, in substance, to give her money orders in $1000 quantities.

Later on Monday, December 17, Maktabi II was observed entering the Empire Hotel in Manhattan. Maktabi I was thereafter observed leaving that hotel and returning to the Sultan's Table. Subsequently Maktabi II left the Empire Hotel and returned to the Sultan's Table. Later that night Maktabi I went to another restaurant and called Maysoon Annabi (wife of Sami Annabi, and also indicted by the grand jury) and said that he "couldn't make it that evening, but would call about 3:30 the next day." Maysoon Annabi asked if he "would bring the cheese," and Maktabi I said that he would.

On the following day, Tuesday, December 18, Katerji drove Maktabi I to Yonkers where Maktabi I was observed meeting with Annabi. All three persons were arrested at that time. Annabi was found to be in possession of a small quantity of a substance which tested positive for heroin; the DEA agents infer that this may have been a sample. Maktabi I had in his possession the key to Room 824 of the Empire Hotel. Kabakibo was arrested in Room 740 of the Bretton Hall Hotel.

No bank checks or money orders were found on any of these persons at the times of their arrest. However, the DEA investigation had revealed that on the date of his arrest, Maktabi I had left a briefcase and a suitcase at a variety store near the Sultan's Table. Mamdouh Cheit, following his release on bail, had taken this suitcase and briefcase from the variety store to the Sultan's Table. The DEA agents, according to AUSA DeVita's affidavit of January 7, 1985, obtained possession of the briefcase and suitcase from Cheit, and on January 2 obtained a warrant to search them. In the

suitcase the DEA agents found 117 bank cashiers' checks, each in the amount of $1000, and each with the payees left blank.

One of the persons arrested during the evening of December 18–19, 1984 stated to DEA agents that Maktabi I was the person who brought heroin in to Annabi.

The DEA agents draw the inference from the foregoing circumstances that Annabi had paid Maktabi I a large amount of cash in connection with a prior delivery of heroin, or for a pending delivery. The $117,000 in cashiers' checks is regarded by the government as additional evidence of the defendants' participation in a narcotics and money laundering conspiracy.

## IV.

The Second Circuit dealt recently with the concept of "probable cause" in *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir.1983), where Judge Kearse wrote:

"The quantum of evidence required to establish probable cause to arrest need not reach the level of evidence necessary to support a conviction, *Wong Sun [v. United States], supra* [371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)]; *Henry [v. United States], supra,* 361 U.S. [98] at 102, 80 S.Ct. [168] at 171 [4 L.Ed.2d 134 (1959)], but it must constitute more than rumor, suspicion, or even a ' "strong reason to suspect," ' *id.* at 101, 80 S.Ct. at 170; *Brinegar [v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)], *supra.* Although the existence of probable cause must be determined with reference to the facts of each case, in general probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested."

While *Fisher* involved probable cause to arrest, counsel at oral argument in the case at bar did not suggest any reason why different criteria should apply to "probable

cause" under § 3142(e) of the Bail Reform Act, and none occurs to me.

Judged by the criteria discussed in *Fisher* and the cases therein cited, I conclude that probable cause exists to trigger the statutory presumption.

I approach the issue, as noted *supra,* in the light of what the Ozaluk complaint reveals about the activities of Sami Annabi and his associates. Given the probable cause therein generated to believe that Annabi was engaged in a complex and widespread heroin importation and distribution conspiracy, relying in part on Middle East sources of supply, anyone coming in contact with him became a natural subject of interest to DEA agents. Furthermore, what the agents had learned about Annabi gave legitimate context and color to the activities of others in relation to Annabi.

■ That analysis is sufficient to demonstrate probable cause in respect of Maktabi I. No detailed analysis is necessary. Maktabi I's meetings with Annabi, his receipt from Annabi of the two white boxes at the Yonkers Raceway parking lot, the subsequent carryings about of hand luggage, the apparently coded references in Maktabi I's telephone conversation with Maysoon Annabi, his activities in obtaining cashiers' checks for large amounts of currency, and the particulars of the cashiers' checks obtained as revealed by the subsequent search of the luggage, all implicate Maktabi I, at least to the level sufficient to satisfy the criteria of probable cause articulated in *Fisher.* In making that evaluation, I am entitled to consider the interpretations placed upon certain of these activities by experienced DEA agents. Such inferences and opinions are admissible at the trial of drug offenses, *United States v. Carson,* 702 F.2d 351, 369–70 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983); *United States v. Young,* 745 F.2d 733, 760–61 (2d Cir.1984). While Judge Newman's concurring opinion in *Young* stresses the caution with which a trial judge should permit such evidence to be considered by a jury, 745 F.2d at 765–66, it seems clear that I may consider the agents' inferences in the present context, and I do so. Furthermore, the inferences drawn are compatible, in the totality of the circumstances, with commonsense.

Maktabi II and Kabakibo are perhaps less central participants, at least as revealed by the present evidence. But probable cause exists to believe that they were affiliated with Maktabi I in his efforts, and facilitators of drug transactions. Maktabi II furnished assistance with the hand luggage as it was transferred from the Sultan's Table to one of the hotels. There is ample reason to believe that the Sultan's Table was being used as a significant staging area and communications center in connection with the transactions. Kabakibo played a part in obtaining highly suspect cashiers' checks in exchange for large quantities of cash which, in the circumstances, are equally suspect.

■ Of course, these acts viewed in isolation are capable of entirely innocent interpretation. And it may be that, at trial, the government will be unable to prove the requisite knowledge and intent, beyond a reasonable doubt, as to any or all of these three individuals. But that determination is for another day, and of course I intimate no opinion with respect to it. I hold only that the evidence before me establishes the requisite "probable cause" under § 3142(e) to trigger the two-pronged statutory presumption in favor of pre-trial detention. Since the present movants have not rebutted the presumption, their motion for review of the detention orders fails.

## V.

For the foregoing reasons, the defendant-movants' motions for revocation or amendment of the orders of detention are denied in their entirety.

It is SO ORDERED.