**UNITED STATES of America, Plaintiff,**

v.

**James CULMER and Frank Jackson, Defendants.**

**No. 89 Cr. 0448 (SWK).**

United States District Court, S.D. New York.

March 21, 1990.

---

Otto G. Obermaier, U.S. Atty., for the S.D.N.Y., by Thomas McC. Souther, Asst. U.S. Atty., New York City, for the Government.

Barbara L. Hartung, New York City, for defendant, James Culmer.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

In this criminal action, defendants James Culmer and Frank Jackson have been charged with possession of cocaine and co-

caine base with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Defendant Culmer is additionally charged with possession of heroin with intent to distribute. 21 U.S.C. § 841(a)(1). In an opinion dated October 30, 1989, this Court denied certain defense motions and ordered a hearing on whether the stop and subsequent arrest complied with the Fourth Amendment and whether post-arrest statements must be suppressed. This Court held a hearing over three days, December 29, 1989, January 10, 1990 and January 12, 1990, and permitted the parties to submit post-hearing memoranda.[1]

## DISCUSSION

The Court heard testimony concerning the arrest and processing from William O'Flaherty, a New York City Police Officer, and Ernest West, a construction worker and the part-time cab driver who drove these defendants and was initially arrested himself. The Court also heard testimony from Ms. Jean Culmer, the mother of defendant James Culmer, who testified that her other son, Michael Singleton, was incarcerated from February through May 30, 1989, the date at which O'Flaherty and the other officers arrested Culmer and Jackson while allegedly looking for Michael Singleton.[2] In their subsequent briefs, defendants attack the credibility of William O'Flaherty and bolster that of Ernest West by arguing that O'Flaherty had a greater incentive to lie. Defendants further contend that West's testimony should not be credited because he testified to additional details at the hearing that were not included in earlier written documents, including the complaint. Defendants also argue that West's testimony is more logical than that given by O'Flaherty. The Court first con-

---

1. This Court's prior opinion sets forth the facts more completely, and familiarity with it is assumed. This opinion sets forth facts as developed at the hearing and necessary for the resolution of the motions.

2. The Court first notes that no independent confirmation of this incarceration has been produced. While the Court notes that Ms. Culmer presumably has a substantial interest in protecting her son, James Culmer, the Court does not

conclude that she lied when she stated that her other son was in jail. Ms. Culmer may have believed that Michael Singleton was incarcerated at that time. He may even have been so incarcerated. The Court, however, does not find sufficient evidence to support the tenuous proposition that Singleton was incarcerated, that these officers knew it, and that the suggestion that they were out looking for him was a mere ruse to cover up a plan to harass Culmer.

siders the evidence surrounding the stop and arrest, and then considers the circumstances of the post-arrest statements.

*Stop and Arrest*

■ The Court first considers whether there was a reasonable suspicion at the time the defendants entered the Lincoln, and whether the officers could have stopped them at that time for questioning. The Court then considers whether the officers could have had a reasonable suspicion of criminal conduct at the time they stopped defendants. Finally, the Court considers the circumstances of the arrest, and whether probable cause was present at the time defendants were arrested. A brief stop is permissible, even absent probable cause, "when an officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *United States v. Hensley*, 469 U.S. 221, 229, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985). In its previous opinion, this Court ordered that the hearing encompass the factual issues surrounding reasonable suspicion for the stop and probable cause for the arrest. These issues included whether the officers had some reasonable suspicion of criminal activity at the time of the stop in light of the fact that they did not stop the defendants after observing Culmer run across the street cradling a package and while the defendants sat in the car waiting for West. The Court also ordered that the parties put on testimony to determine if the arrest actually preceded the discovery of the drugs, or whether as the government contended, the defendants were not handcuffed and arrested until after the drugs were found pursuant to a legal frisk of the brown paper bag. Regarding the stop, defendants contend that the requisite reasonable suspicion was absent even if the Court credits the testimony of Detective O'Flaherty.

The Court observed the witnesses presented in the hearing and found, contrary to defendants' contention regarding motive to falsify, that officer William O'Flaherty was an excellent witness who testified knowledgeably and credibly. O'Flaherty testified that on May 30 he and other officers were looking in the vicinity of West 145th Street and Broadway for two fugitives from a prior case, one of whom was thought to be James Culmer's brother, Michael Singleton. O'Flaherty, an experienced narcotics officer, testified that he had conducted ten to twelve narcotics investigations in this area. Transcript of January 10, 1990, at 28. As the officers searched this area, Detective Joseph recognized James Culmer who was running up the east side of Broadway in the direction of West 145th Street. Culmer ran with a package that was cradled under his arm and covered by his jacket.

The officers apparently knew Culmer. Detective Joseph immediately identified him as the brother of Michael Singleton, one of the fugitives sought at that time by the team of officers. According to O'Flaherty, Culmer also was recognized by Joseph because Culmer had been a defendant in that prior case involving his brother in which drugs and two handguns were recovered. In that prior case, Detective Joseph was sent into an apartment to make a "pre-warrant buy" where he met Michael Singleton and James Culmer. Culmer "roughed up" Joseph during the course of making the buy. As Joseph left the building accompanied by Singleton, Joseph first noticed that Singleton had a gun. Joseph then attempted to apprehend Singleton, but was only able to recover the gun from Singleton as he fled. The officers then executed their search warrant in the prior case and arrested Culmer, while a third individual known only as "BJ" jumped from the apartment window and escaped. Thus, O'Flaherty explained that he and the four other officers were looking for "BJ" and Michael Singleton at the time they first observed Culmer's suspicious conduct.

O'Flaherty further testified that Culmer was observed running until he met Jackson in the street, that they spoke briefly, and that they both then got into the back seat of a Lincoln Continental Town Car with out-of-state license plates. The officers did not stop defendants at this time, but waited as Jackson called out the window to someone. Shortly thereafter, Ernest West entered the driver's side and began driving

the car toward Riverside Drive, then north on Riverside. The parties disagree as to the time that expired between when the defendants entered the car and when West appeared and began driving. O'Flaherty stated that only a couple of minutes passed, not the ten to fifteen minutes claimed by defendants.

The following circumstances might reasonably suggest to a seasoned narcotics officer some criminal activity at the point defendants entered the Lincoln: (1) the officers' knowledge that the area had a relatively high amount of drug trafficking; (2) the officers' reasonable belief that they might find Singleton in this neighborhood because they believed that he resided with his mother who lived there; (3) knowledge of Culmer's relationship to and prior involvement with a suspected fugitive in a prior case involving drugs and two handguns; (4) the observation of Culmer dashing toward a parked Lincoln while apparently concealing a package cradled under his arm and underneath his jacket, (5) the apparent involvement and concerted activity of another individual, later identified as Jackson, in Culmer's endeavors, (6) and their entering the back seat of a Lincoln with out-of-state plates. The totality of these circumstances could reasonably suggest that an individual—who they reasonably thought had been involved in prior drug trafficking in which an officer was assaulted and drugs and firearms were recovered—was now actively engaged in suspicious, concerted activity with two others. Even though the defendants were not stopped at this time, additional observations by officer O'Flaherty further support a finding of reasonable suspicion at the time Culmer and Jackson were stopped.

The officers followed the car west and then north to Riverside Drive. O'Flaherty testified that the Lincoln had made an illegal right turn through a red light and was travelling at an excessive rate of speed. O'Flaherty further stated that as he followed them he saw both defendants in the back seat of the car, and that both heads turned to look out the back window at him. O'Flaherty could specifically make out Culmer's face as Culmer looked to see who might be following the Lincoln. Upon noticing that Culmer and Jackson apparently had taken an interest in whether they were being followed, O'Flaherty identified himself as a police officer over his loudspeaker and ordered the Lincoln to pull over.

The Supreme Court has stated that the reasonableness of stops or seizures that are less intrusive than a traditional arrest, as in the case of the initial stop here, depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Brown v. Texas*, 443 U.S. 47, 50, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977)). Balancing these policies, the Court has upheld limited stops of cars for the purpose of questioning, even absent probable cause, where the police at least have an

> articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law....

*Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979). In *Brown*, the Court held that the officers lacked a reasonable, articulable suspicion of criminal activity where the defendant was unknown to the officers, who merely saw him walk away from another individual in a public alley in a narcotics-ridden area. The officers in that case could not identify any suspicious activity that might suggest that Brown was involved in criminal activity. Brown was searched and nothing incriminating was found, but he was arrested, prosecuted and convicted under a statute that made it an offense to refuse to answer an officer's questions after a legal stop. The Court held that the stop was not legal, as the officers lacked a reasonable and articulable basis for their suspicion. In contrast, O'Flaherty has articulated a basis for the officers' reasonable suspicion that Culmer and Jackson may have violated the law. O'Flaherty's

observation of Culmer and Jackson peering at him through the rear window, the excessive rate of speed and the illegal right turn, combined with the above-enumerated six initial factors suggesting criminal activity, clearly satisfy the reasonable, articulable suspicion standard.

■ The Court now considers whether the warrantless arrest was made here with probable cause. Probable cause has been defined in this Circuit, as follows:

> probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested.

*United States v. Fisher*, 702 F.2d 372, 375 (2d Cir.1985). The analysis of probable cause requires an evaluation of the totality of the circumstances, and the Supreme Court has directed that it is "a fluid concept—turning on the assessment of probabilities in particular factual contests." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983).

The testimony of O'Flaherty and West further conflicted on the circumstances of the arrest. The Court cannot accept defendants' contention that O'Flaherty lied. Instead, the Court finds him to be a credible witness after listening to his testimony and observing his demeanor. O'Flaherty's testimony stood up well on cross-examination; West's testimony, however, was weakened by apparently lying about the circumstances of how, where and from whom the Lincoln was rented, and that his wife had rented it, not him. West also did not readily admit that his licence was suspended in March 1989, whether or not it had been later reinstated by May 30, 1989. Similarly, he admitted that he had a prior felony conviction record, but failed to admit a very recent arrest by the Ossining Police Department until confronted a second time with this arrest on cross-examination.

O'Flaherty testified that he approached the driver's side and that he saw Culmer kicking and motioning at something near his feet. At this point, he instructed all three occupants of the car to get out, which he states they did on their own. They were then led to the rear of the car where they were told to put their hands on the trunk. According to Detective O'Flaherty, he did not have his gun out and defendants were not arrested at this time, but only temporarily detained. O'Flaherty then walked to the rear back door, which had been left open, and saw a brown paper bag on the floor where Culmer had been kicking. O'Flaherty testified that he reached in and felt the paper bag, which was hard and could have contained a weapon. He therefore opened the bag. The bag did not contain a knife, gun or other weapon, but did contain large, hard pieces of "crack" cocaine and approximately 125 grams of powdered cocaine. Following this discovery, according to O'Flaherty, these defendants were put under arrest.

West's testimony depicted a stop that reasonably could be described as an arrest. In reliance on this testimony, defendants contend that they were arrested before the officers had probable cause. West testified that all five officers approached the car with guns drawn "a little above their waist. Not point range, but above their waist." Transcript of January 10, 1990 at 23. West further testified that the officers physically lifted these defendants from the car, brought them to the back of the car and handcuffed them at least four or five minutes before O'Flaherty found the drugs.

■ The Court does not accept defendants' argument that O'Flaherty must be lying, or the suggestion that West had a greater incentive to be truthful given his reluctance to testify and his lack of interest in the outcome. The Court credits O'Flaherty's testimony regarding the arrest and finds that it took place only after the drugs were found. Furthermore, the Court also notes that the officers had a reasonable basis for believing that these defendants may have been dangerous, as Culmer had recently attacked Detective Joseph and previously was arrested in connection with a narcotics offense that involved handguns.

Under these circumstances, it was not unreasonable for O'Flaherty to suspect that what Culmer was trying to hide under the seat was a gun, knife or other weapon. Consequently, it was reasonable to frisk the brown paper bag, as a protective search, after O'Flaherty observed Culmer attempt to kick it under the seat. *See Michigan v. Long*, 463 U.S. 1032, 1049–50, 103 S.Ct. 3469, 3480–81, 77 L.Ed.2d 1201 (1983) (where police saw knife in car, Court held that protection of police and others can justify a protective search as long as police have a reasonable belief that the suspect poses a danger, as roadside encounters between the police and suspects are hazardous). During these proceedings, the Court had an opportunity to handle the brown paper bag with its original contents, and the Court concluded on the record that the hard pieces in the bag could have been reasonably mistaken as a weapon.

This Court finds that the requisite level of suspicion existed at the time of the initial stop and the later arrest. Therefore, the remaining motions to suppress physical evidence are denied.

*Post–Arrest Statements*

█ Pursuant to the above analysis, the Court denies defendants' motions to suppress the post-arrest statements as fruit of an illegal arrest. *See, e.g., Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The Court now considers the testimony of West and O'Flaherty on the issue of whether the defendants were read their *Miranda* rights, whether such rights were knowingly and voluntarily waived, and whether any of these statements were elicited in a manner that would otherwise render them involuntary.

O'Flaherty testified that defendants were first read their rights at the time they were arrested, that each defendant was placed in a separate cell at the DEA's headquarters, and that West was interviewed first, followed by Culmer and then Jackson. Prior to questioning, as stated by O'Flaherty, each defendant was read his rights a

second time. According to O'Flaherty, the post-arrest statements at issue were voluntarily made after each defendant received his *Miranda* warnings a second time. Furthermore, O'Flaherty testified that neither defendant was offered any *quid pro quo* for cooperating, such as an immediate release. Specifically, he denied that he promised Culmer that he would be released if he confessed. Transcript of December 29, 1990, at 22. He further stated that Jackson never said that he did not want to talk to them, but in fact stated that he wanted to cooperate. *Id.* at 24, 27.[3]

West testified that he overheard portions of the questioning of Culmer and Jackson "vaguely, between doors, you know, steel bars." Transcript of January 10, 1990, at 28. He testified that he overheard some questions relating to what they had been doing and where they had been going, but he did not specifically hear the officers read the *Miranda* warnings to either Culmer or Jackson. Putting all credibility problems aside, West clearly lacked the opportunity to monitor these interrogations. It is perfectly plausible that he merely did not hear the rights being read from his vantage point in his own cell. In addition to any limitation on his ability to observe what happened at DEA headquarters, West's testimony regarding the circumstances of the arrest demonstrated considerable confusion and a faulty recollection of how he got onto Riverside Drive. As stated before, West's credibility was weakened on cross-examination.

After considering the affidavits submitted in relation to this Court's prior opinion and the subsequent hearing testimony, the Court finds that the government has satisfied its burden of showing that the defendants were read their rights, that they each voluntarily waived their rights and that each defendant then made a post-arrest statement. There is no basis on this record to credit the allegation that the officers either disregarded the defendants' expressed desire not to talk, or that the offi-

---

**3.** In these statements, according to O'Flaherty, Jackson essentially stated that the drugs were Culmer's not his, *id.* at 24, while Culmer stated

that it was Jackson's idea to sell the narcotics in Plainfield, New Jersey, where market demand apparently set a higher retail price. *Id.* at 21.

cers suggested that the defendants could go free if they cooperated. For these reasons, the motions to suppress the post-arrest statements are denied.

### CONCLUSION

Defendants motions to suppress physical evidence and post-arrest statements are denied for the aforementioned reasons.

SO ORDERED.