UNITED STATES of America,
Plaintiff-Appellee,

v.

Leroy FISHER, Defendant-Appellant.

No. 212, Docket 82–1149.

United States Court of Appeals,
Second Circuit.

Argued Nov. 30, 1982.

Decided March 8, 1983.

Friendly, Circuit Judge, filed dissenting opinion.

Michael A. Brady, Asst. U.S. Atty., Buffalo, N.Y. (Salvatore R. Martoche, U.S. Atty., W.D.N.Y., Carol E. Heckman, Asst. U.S. Atty., Buffalo, N.Y., on brief), for plaintiff-appellee.

Herbert Greenman, Buffalo, N.Y. (Paul V. Hurley, Palmer, Greenman & Hurley, Buffalo, N.Y., on brief), for defendant-appellant.

Before FRIENDLY, MANSFIELD, and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Leroy Fisher appeals from a judgment of conviction entered in the United States District Court for the Western District of New York, before Charles L. Brieant, Jr., *Judge* (sitting by designation), following his plea of guilty to a single count of bank larceny in violation of 18 U.S.C. § 2113(b) (1976).[1] Fisher's plea was entered pursuant to a court-approved agreement preserving his right to appeal the denial by the district court, John T. Elfvin, *Judge,* of his motion to suppress a pretrial identification of him on the ground, *inter alia,* that he had been arrested without probable cause and that the identification was a product of the unlawful arrest. We agree that the motion to suppress should have been granted on this ground,[2] and we vacate the judgment and remand to permit Fisher to withdraw his guilty plea.

**1.** 18 U.S.C. § 2113(b) in pertinent part provides:

> (b) Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding $100 belonging to, or in the care, custody, control, management, or possession of any bank, credit union, or any savings and loan association, shall be fined not more than

## BACKGROUND

According to the evidence presented by the government at the hearing on Fisher's suppression motion,[3] the following events led to Fisher's arrest some thirty-five minutes after a bank robbery. At approximately 12:20 p.m. on August 12, 1981, a Buffalo, New York, police radio transmission informed patrol cars that a certain branch of the M & T Bank had just been robbed. The radio dispatcher provided a license plate number for a red automobile used in the robbery and a few minutes later advised that the car was registered to a Christopher Young whose address was 254 Bissell Street. Police Officer Ronald F. Skotnicki and his partner went to 254 Bissell where they and other officers learned that Young was not at home, having left earlier that day in his car, in the company of one Ronald Evans, who lived at 118 Moselle Street. Young's wife told the officers that Young and Evans were supposed to be painting a house on Moselle, which was one block west of Bissell.

At about the same time Police Officer Joseph T. Ransford, in another patrol car, located Young's car parked, unoccupied, approximately in front of 43 St. Louis Street. He saw three or four Black males on a porch, one or two houses south of Young's car. The car and the porch were on the east side of St. Louis, which was one block west of Moselle. Ransford parked his car around the corner from St. Louis at a point where he could observe Young's car and could not be seen by the people on the porch. Ransford could describe only one of the three or four individuals on the porch; that one was a light-skinned Black in his twenties, wearing a large straw hat. Ransford asked the radio dispatcher for descriptions of the robbers. The dispatcher, who had previously reported that Young was

> $5,000 or imprisoned not more than ten years, or both; ....

**2.** We do not reach Fisher's other contention, also rejected by the district court and pursued on appeal, that the identification was the result of an impermissibly suggestive showup.

**3.** Fisher presented no evidence.

20–21 years old, then received descriptions of the robbers from a police officer at the bank and relayed them as follows:

> [T]he only thing I've got is, uh, three Black males, all about 5′ 10″ to 6 feet tall. One's got on a, uh, rust colored sweater, another guy's got on a blue wool hat, at least two of them were armed.[4]

The dispatcher shortly relayed further information from an officer who had spoken with Young's wife, to wit, that Young was a light-skinned Black with a heavy build and tightly curled hair, and that Evans was 5′ 6″ or 5′ 7″ tall.

In the meantime, Skotnicki had left Bissell Street and gone to Moselle Street, in case the robbers tried to cut through backyards to get from St. Louis to Evans's home at 118 Moselle. Skotnicki parked across from the house at 32 Moselle, which was back-to-back with the house at 43 St. Louis, not far from which Young's car was parked. About five minutes later, Fisher, a tall, slim, young, dark-skinned Black male wearing jeans and a white T-shirt emerged from the side of 42 Moselle and commenced to walk north on Moselle. When he was approximately opposite the next house he stopped and returned to Number 42, stood by the porch of that house for perhaps half a minute, then turned and began walking north again. About a half-minute later, a shorter, heavier, light-skinned young Black wearing a straw hat walked out of a yard two houses south of 42 Moselle and began walking north.

Skotnicki and his partner drove up Moselle and pulled up alongside the first Black, at about 66 Moselle, and stopped him. Skotnicki asked his name; he told them it was Leroy Fisher. The officer asked what Fisher was doing coming out of the yard at 42 Moselle; Fisher said he was cutting through from a friend's house. Skotnicki asked Fisher if he had any identification; he said he had none. The record does not indicate that the officers asked any other questions. Skotnicki placed Fisher under arrest.

In the meantime, the heavier, light-skinned Black in the straw hat had disappeared into a yard. Skotnicki and his partner shouted this information to Ransford and his partner, who had just come to Moselle, having been relieved of their stakeout of Young's car by other officers. Ransford found the straw-hatted individual, who identified himself as Christopher Young, on the back porch at 62 Moselle and arrested him.

The arrests were reported to the radio dispatcher at about 12:51 p.m. When Skotnicki's partner reported the arrest of Fisher, he did not give Fisher's name but rather called him "Little," which the radio dispatcher interpreted as meaning the little man, *i.e.*, Evans. The dispatcher instructed Ransford and Skotnicki to bring Young and "Evans" to the bank for possible identification. Young and Fisher were returned to the bank to be viewed by eyewitnesses to the robbery. Following this "showup," Faith Parkin, a teller, identified Young and Fisher as two of the three individuals she had observed putting on masks beside a red Mustang outside of the bank just prior to the robbery.

Eventually Fisher, along with Young and Evans, was indicted on three counts of bank robbery, in violation of 18 U.S.C. §§ 2113(a), (b), and (d), respectively. Fisher moved to suppress Parkin's pretrial identification of him, contending, *inter alia,* that he had been arrested without probable cause and that the identification was the product of his unlawful arrest. After a hearing at which the evidence described above was presented, Judge Elfvin denied the motion. While the court found Fisher's contention "very tenabl[e]," Decision dated January 16, 1982, at 2, it concluded that probable cause had existed, stating as follows:

> What converts . . . the uncertainty of probable cause in the context of the

---

**4.** The officer at the bank also told the dispatcher that one of the robbers had a thin build and wore dark clothes, and that the robber in the rust-colored sweater wore black gloves. The radio transcript does not indicate that this information was relayed by the dispatcher to the patrol units, but Skotnicki testified that he recalled having heard it.

above factual recitation to clear probable cause is an item ... which the arresting officer must then have known—to wit, Young, the owner and possessor of the getaway car which was parked on St. Louis Street, was light skinned and heavy set and with curly hair and the second young black male who had fairly simultaneously come to the west side of Moselle Street from the direction of St. Louis Street was light skinned and heavy set and wearing a straw hat. This juxtaposition of parked getaway car and its owner's appearance of·having come from its direction and Fisher's odd performance while proceeding in the same direction as did the car's owner gave the arresting officer probable cause to arrest Fisher. . . . All of this was within about one-half hour of the bank robbery and the car owner's description had been promulgated via the police radio system. Seeing Young emerge and act as he did undoubtedly put the icing on the probable cause cake for the officer. That he arrested Fisher who was more northerly on the street than was Young and left the latter to be relocated in a Moselle Street back yard does not flaw the above.

*Id.* at 3–4 (footnote omitted).

Thereafter, pursuant to an agreement with the government, which was approved by the court, Fisher pleaded guilty to a single count of bank larceny in violation of § 2113(b), while preserving his right to appeal the denial of his motion to suppress; the government consented to the dismissal of the other two counts against Fisher; and Fisher testified for the government at the trial of Young and Evans.[5] Fisher was sentenced to time served plus a period of probation not to exceed four years.

## DISCUSSION

It is fundamental that because Fisher's arrest was made without a warrant it was unlawful unless it was made upon probable cause.[6] *Dunaway v. New York,* 442 U.S. 200, 208 & n. 9, 99 S.Ct. 2248, 2254 & n. 9, 60 L.Ed.2d 824 (1979); *Wong Sun v. United States,* 371 U.S. 471, 479, 83 S.Ct. 407, 412, 9 L.Ed.2d 441 (1963); *Henry v. United States,* 361 U.S. 98, 100, 80 S.Ct. 168, 170, 4 L.Ed.2d 134 (1959); *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949); *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925). The quantum of evidence required to establish probable cause to arrest need not reach the level of evidence necessary to support a conviction, *Wong Sun, supra; Henry, supra,* 361 U.S. at 102, 83 S.Ct. at 171, but it must constitute more than rumor, suspicion, or even a " 'strong reason to suspect,' " *id.* at 101, 83 S.Ct. at 170; *Brinegar, supra.* Although the existence of probable cause must be determined with reference to the facts of each case, in general ·probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested. *Dunaway v. New York, supra; Brinegar, supra; Wong Sun, supra; see Mallory v. United States,* 354 U.S. 449, 456, 77 S.Ct. 1356, 1360, 1 L.Ed.2d 1479 (1957).

In determining whether probable cause exists to believe that a particular person has committed a given crime, the Supreme Court has indicated that where the information possessed by the officers could have applied to any of a number of persons and did not reasonably single out from that group the person arrested, the arrest was not made with probable cause. In *Wong Sun, supra,* the Court ruled that information that narcotics had been sold by a per-

5. Young and Evans were found guilty on all three counts described above. Young did not appeal his conviction. Evans's conviction was affirmed by this Court by summary order in *United States v. Evans,* No. 82–1169 (2d Cir. Dec. 20, 1982).

6. State law governs the validity of this warrantless arrest, *see United States v. Di Re,* 332 U.S. 581, 589 (1948), and the New York criterion for such arrests conforms to the federal standard of probable cause, *see United States v. Rosario,* 543 F.2d 6, 8 n. 1 (2d Cir.1976).

son known as "Blackie" Toy, proprietor of a laundry on Leavenworth Street, did not constitute probable cause to arrest James Wah Toy, a laundry proprietor on that street, since there were several laundries on Leavenworth Street, several persons named Toy, and no indication in the record that the agents had "information of some kind which had narrowed the scope of their search to this particular Toy." 371 U.S. at 481, 83 S.Ct. at 414. Similarly, in *United States v. Rosario,* 543 F.2d 6 (2d Cir.1976), this Court held that where an undercover narcotics agent had twice purchased heroin in Brooklyn from one Gonzalez who was aided in negotiations both times by an unidentified White male, possibly called "Angel," who was casually dressed, about 28 years old, 5' 8" tall, 155 pounds, with a light complexion, probable cause did not exist to arrest, seven weeks later, a casually dressed male companion of Gonzalez named Angel Rosario who was White, 32 years old, 5' 7" tall, and weighed 155 pounds. We remarked that the physical description of Gonzalez's confederate given by the undercover agent "would fit a very large group of ordinary young men," *id.* at 8, and that there were five persons named Angel Rosario in the 1976–77 Brooklyn telephone book, *id.* n. 5.[7] *See also United States v. Jackson,* 652 F.2d 244, 247–48 (2d Cir.) *cert. denied,* 454 U.S. 1057, 102 S.Ct. 605, 70 L.Ed.2d 594 (1981), in which we ruled that when officers had information that a bank had just been robbed by a Black male in his twenties, with a medium "afro" haircut, whose approximate height was six feet and weight was 150 pounds, dressed in a light brown coat and hat and a grey sweater, and that the robber had fled northward on foot along the street on which the bank was located, probable cause did not exist to arrest, minutes later, a Black male in his twenties with a medium afro haircut and wearing a coat that appeared tan from a distance, who was driving southward along the same street (*i.e.,* from the direction in which the robber had run), and who, while stopped in traffic near the bank, suspiciously stared straight ahead, deliberately ignoring the commotion caused by the presence of many police cars.

■ Other factors to be considered in determining whether there is a sufficient basis for arresting a particular individual for a given crime include whether the locale and the time of day increase the likelihood that the individual suspected is the person sought. For example, if the person sought is Black and the neighborhood under surveillance is predominantly Black, the presence of a Black person on the street will have less significance than it would if the neighborhood were predominantly White. *See, e.g., United States v. Shavers,* 524 F.2d 1094, 1095 (8th Cir.1975) ("The population ... was estimated at trial to be about 50% black, and a great number of men stand about 5' 8" in height.... At 9 o'clock on any weekday morning, many individuals answering to the broadcast description could be found in a business district such as the one where Shavers was arrested.").

■ In the present case, the police officers had a reasonably articulable suspicion sufficient to justify stopping Fisher for questioning. *See, e.g., United States v. Cortez,* 449 U.S. 411, 417–21, 101 S.Ct. 690, 694–697, 66 L.Ed.2d 621 (1981); *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640–2641, 61 L.Ed.2d 357 (1979); *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979); *United States v. Brignoni-Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2581–2582, 45 L.Ed.2d 607 (1975); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The officers had reasonable grounds for believing that at least two of the three robbers were in the vicinity of St. Louis Street. They knew that Young's car had been used as the geta-

---

7. *See also Commonwealth v. Jackson,* 459 Pa. 669, 331 A.2d 189, 191 (1975) (where the two assailants were described as Black male youths in dark clothing, 5' 6" to 5' 8" in height, with medium builds, medium-to-dark complexions, and semi-bush haircuts, probable cause did not exist to arrest, one block away from scene of the crime, the defendant, who fit that description, since it "was equally applicable to a great many individuals in the area." Indeed, four additional suspects were seized in the same block.).

way car and that it was currently parked near 43 St. Louis; that Young and Evans had gone off together earlier in Young's car; that Evans's own car was currently parked near his home at 118 Moselle, one block east of St. Louis. They knew that Young was a heavy-set, light-skinned Black, age 20 or 21, with tightly curled hair. They knew that there were three or four Black males on a porch on St. Louis near Young's car, including a light-skinned Black in his twenties. They knew that all three robbers were Black males, two or more of whom were tall. Skotnicki observed Fisher, a tall Black male, arrive on Moselle Street from between houses on the side of Moselle that backed on St. Louis, walk north in the direction of Number 118 where Evans was known to reside, and return to stand by the porch of Number 42 before resuming his trek northward. And within a half-minute of Fisher's resumption of his walk north, Skotnicki observed a heavy-set, young, light-skinned Black appear on Moselle Street from between houses on the side of Moselle that backed on St. Louis and head north.

We think it clear, however, that the officers did not have probable cause to arrest Fisher at the time of the stop. Skotnicki had only the most general description of the robbers that would have fit Fisher: they were tall (perhaps slim, *see* note 4 *supra* and surrounding text) Black males. He had no description of their ages except for Young, who was known to be 20–21 years old. He had clothing descriptions for two of the robbers: a rust-colored sweater and a blue wool hat; but these descriptions did not help, for Fisher was wearing a white T-shirt and no hat. Skotnicki knew that there were some suspects on a porch on St. Louis; but he had never seen them or received any description of them, and he did not know whether they were tall or short, young or old, or what any of them was wearing.[8] Even Ransford, having seen the people on the porch, who were apparently seated, was unable to describe any of them as to height or weight; and, other than the light-skinned male with the straw hat, he did not describe any of them as young. And when Skotnicki stopped Fisher, the officers did not know whether all or any of the individuals who had been on the porch on St. Louis were still there. Finally, we note that Skotnicki testified that when he saw Fisher emerge and then Young emerge on Moselle Street, he did not infer that Young was "with" Fisher.

In our view nothing Fisher said or did in response to questioning when he was stopped provided probable cause for his arrest. The only suggestive fact he disclosed in his answers was that he was cutting through from a friend's house. This revealed that he had not come out of the house at 42 Moselle, from whose side Skotnicki had seen him emerge, and permitted the inference that he had come from a house on St. Louis. But he apparently was not asked from what house he had come, and there was little basis for inferring that he had come from the pertinent porch on St. Louis. Fisher had emerged from the yard at 42 Moselle; but that house apparently was not opposite or adjacent to the house on St. Louis on whose porch the Black males had been observed. Number

---

8. Skotnicki's testimony at the hearing was as follows:

> Q What other information did you have?
> A We also knew that there were some suspects on a porch near the car. . . .
> Q Do you know what they looked like?
> A No.
> Q Do you know what race they were or did you have any information?
> A Well, we knew that there was three black males and that their height was between 5' 10" and 6 feet tall.

(September 28, 1981 Transcript at 81.) In light of Skotnicki's earlier negative answer to the question clearly directed toward his knowledge of the appearances of the persons on the porch, and given the absence of any descriptions of the porch's occupants in the police radio transmissions and Ransford's inability to give descriptions of anyone other than Young, we construe Skotnicki's latter answer that he knew of three black males, 5' 10" to 6' in height, as merely a reference to the descriptions of the robbers that had been relayed from the bank.

We note also that, except as to Christopher Young, the district court's description of the men on the porch as "young" is unsupported by the record.

42 Moselle was north of 32 Moselle, which was the house that was back-to-back with 43 St. Louis; and 43 St. Louis was one or two houses north of the porch on which Ransford had seen the Black males. Thus, to get from the porch on St. Louis to 42 Moselle, one would have to walk north past several houses, including 43 St. Louis and/or 32 Moselle. Skotnicki, who was opposite 32 Moselle watching in a westerly direction, alert for robbers who might try to cut through from St. Louis to Moselle, apparently did not notice anyone cutting northward through the yards. Ransford, who had positioned himself at a spot where he could not clearly see the pertinent porch on St. Louis but could see the sidewalk, did not see anyone leave the porch and walk up the sidewalk. In sum, Fisher could not be identified as a person who had been on the porch on St. Louis; when he was arrested, none of the officers had any idea whether anyone had left the porch; and no one had seen Fisher proceeding north between that porch and 42 Moselle.

 Viewing the circumstances as a whole, there are other factors as well that give us pause in our review of the district court's probable cause determination. First, it does not appear that the court should have given weight to Skotnicki's characterization of Fisher's pausing and backtracking as suspicious actions. Although the court apparently thought Fisher's behavior "odd," "strange," and "evasive," Skotnicki did not state that Fisher gave any appearance of checking for surveillance, see, e.g., United States v. Vasquez, 638 F.2d 507, 513 (2d Cir.1980), cert. denied, 454 U.S. 847, 102 S.Ct. 165, 70 L.Ed.2d 135 (1981), or that Fisher made any movement apparently designed to avoid encounter with a police officer, see id. at 530 n. 15; nor did Skotnicki articulate any other basis for viewing Fisher's actions as ground for inferring that Fisher was a bank robber rather than merely an innocent indecisive stroller. The experience of a police officer is a factor to be considered in the determination of probable cause, see United States v. Cortez, supra, 449 U.S. at 418, 101 S.Ct. at 695, but the relevance of the suspect's conduct should be sufficiently articulable that its import can be understood by the average reasonably prudent person, see, e.g., id.; Brown v. Texas, supra, 443 U.S. at 51–52 & n. 2, 99 S.Ct. at 2640–2641 & n. 2; United States v. Brignoni-Ponce, supra, 422 U.S. at 884–86, 95 S.Ct. at 2581–2582. From all that appears in the record, Fisher's conduct was entirely ambiguous, and ambiguous conduct does not provide probable cause for arrest. See Wong Sun, supra, 371 U.S. at 484, 83 S.Ct. at 415 (flight, in the circumstances, held ambiguous, and hence insufficient to give probable cause for arrest).

Second, we note that at the hearing Ransford repeatedly mentioned that the Black males on the porch on St. Louis numbered three or four. If there were four, at least one of them was not one of the robbers. In those circumstances, even if it were known that all three robbers were on the porch, and if Fisher was one of four people on the porch, there would have been no legitimate inference that Fisher was one of the robbers. See Johnson v. United States, 333 U.S. 10, 16, 68 S.Ct. 367, 370, 92 L.Ed. 436 (1948) (agents who smelled opium through hotel door lacked probable cause to arrest occupant until they learned that she was the only person present and were thereby given a reasonable basis for inferring that the opium smoker, and hence the illegal possessor of the drug, was she).

Finally, Skotnicki was on the alert for a person walking northward toward 118 Moselle because that is where Evans lived, and the officers thought the robbers might try to hide with Evans. Yet if a person walking north on Moselle were heading toward his own home on that street, no inference that that person was en route to a rendezvous with Evans would be warranted. An officer of reasonable caution would have sought to ascertain whether the person who appeared was a resident on the street. Skotnicki apparently did not ask Fisher, a Black in a predominantly Black neighborhood, where he lived. In fact, it appears that Fisher occupied an apartment at 118

Moselle[9] and therefore was in fact walking toward his home.

Fisher apparently answered truthfully each of the few questions asked him when he was stopped. The fact that the officers may have believed that he was concealing his true identity did not improve the basis for the arrest since Fisher in fact had responded truthfully and the officers had no reasonable basis for believing he had lied.[10] *Compare United States v. Jackson, supra,* 652 F.2d at 251, in which the suspect gave some responses after the investigatory stop that were known to be false and others that were highly improbable.

In sum, the information available to Skotnicki was equally applicable to a number of individuals likely to be in the area. If probable cause existed for the arrest of Fisher, it would have existed for the arrest of virtually any Black male who, at lunchtime in a predominantly Black neighborhood, happened to come through a backyard on the west side of Moselle and begin to walk north on Moselle shortly before Young appeared. Such a person could have been young or old, could have been dressed in any type of clothing, could have been a resident on Moselle, and could have come from a porch on St. Louis where all three robbers remained, or could have come from any other house on St. Louis. We conclude that the officers did not have sufficient basis for inferring that Fisher in particular was one of the three robbers; the arrest was thus made without probable cause.

 There is no doubt that the showup at the bank was a direct product of Fisher's arrest. Since we hold that arrest unlawful, any identifications of Fisher on the basis of that showup must be suppressed as the fruits of the unlawful arrest. *See Brown v. Illinois,* 422 U.S. 590, 599, 95 S.Ct. 2254, 2259, 45 L.Ed.2d 416 (1975); *Wong Sun, supra,* 371 U.S. at 488, 83 S.Ct. at 417–418.

The judgment of conviction is vacated and the case is remanded to permit Fisher to withdraw his guilty plea. On remand, if the government pursues the prosecution of Fisher and wishes to have Parkin make an in-court identification of him, the court will be required to determine whether Parkin has an adequate basis for such an identification independent of the showup.

FRIENDLY, Circuit Judge, dissenting:

Although this is a close case, I respectfully dissent. The majority seems to be saying in effect that law enforcement officers cannot rely on what on their face are sufficient indicia of probable cause of guilt but must thoroughly consider circumstances that might show the suspect's probable innocence. This sets the standard of probable cause for arrest too high. I would affirm on the well-considered opinion of the trial judge who was familiar with local conditions and saw and heard the witnesses.

---

**9.** Evans so stated to FBI agents in an interview on the night of August 12.

**10.** Although Skotnicki did not so testify, it appears that he and his partner may have believed that Fisher had given them a false name and was in fact Evans. Although Fisher told them that his name was Leroy Fisher, the officers never reported this to the radio dispatcher; instead they reported that the man they had was "Little," which the dispatcher interpreted as meaning "the little man," which was the way Evans had been described. The officers never disabused the dispatcher of this notion when the latter told them to take "Evans" to the bank for the showup, and they even described Fisher's garments when the dispatcher asked how "Evans" was dressed. Thus it may be inferred that the officers thought they had stopped Evans and that Fisher had falsely identified himself. There was no basis for this since Fisher did not fit the description the officers had of Evans. And, had the officers asked Fisher where he lived, it seems likely that he would have told them and thus quickly been able to obtain and provide identification confirming that he was Leroy Fisher and not Ronald Evans.