UNITED STATES of America, Appellee,

v.

Frankie VALEZ, Defendant-Appellant.

No. 1318, Docket 86–1049.

United States Court of Appeals,
Second Circuit.

Argued May 22, 1986.
Decided July 10, 1986.

· Thomas Moseley, Asst. U.S. Atty., S.D. N.Y. (Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., Kenneth Roth, Asst. U.S. Atty., New York City, of counsel), for appellee.

Thomas M. O'Brien, The Legal Aid Society, Federal Defender Services Unit, New York City, for defendant-appellant.

Before LUMBARD, OAKES, and MES-KILL, Circuit Judges.

LUMBARD, Circuit Judge:

Frankie Valez appeals from a judgment of conviction entered in the Southern District on January 17, 1986 following his conditional guilty plea before Judge Richard Owen to a charge of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841. Judge Owen sentenced Valez to three years' imprisonment to be followed by ten years' special parole, and imposed on Valez a $50 assessment. Pursuant to his plea agreement and Fed.R. Crim.P. 11(a)(2), Valez reserved his right to appeal Judge Owen's denial of his pretrial suppression motion. We affirm.

At 4:30 p.m. on October 16, 1984, New York City Police Sergeant Albert Zarr and Officer James Allen were parked in a surveillance vehicle on West 48th Street between Eighth and Ninth Avenues in Manhattan. Zarr sat near the rear window of the vehicle watching the street with binoculars; Allen remained in the front seat. After observing what appeared to be a narcotics sale on the southeast corner of 48th and Ninth, Zarr sent one of his undercover police officers to make a drug buy.

Zarr saw the undercover officer hand money to two men at the corner and, in return receive two packets that later proved to contain cocaine. Zarr observed that one of the sellers was an Hispanic male in his twenties, wearing a black leather jacket, grey pants with a comb in the back pocket, and a white or off-white V-neck shirt with dark trim on the collar.

Zarr described the sellers to Allen and radioed the description to the field team. At that point, the seller with the black jacket walked around the corner and disappeared from view. Zarr instructed Allen to follow the subject and make an arrest.

Allen left the van immediately and proceeded west on 48th Street and then south on Ninth Avenue in search of the seller. Allen walked to the next corner, but did not see his subject. He decided to turn back on the hunch that the seller had ducked into one of the stores. When Allen returned to the corner of 48th and Ninth, he saw a man coming out of a Blimpie's fast food restaurant who matched the description that Zarr had given him. At 4:40 p.m., five to ten minutes after Allen left the

surveillance van, he arrested the man. The person whom Allen had arrested was Valez.

Because Allen did not have a police radio, he telephoned the emergency number 911 for assistance. A squad car responded to Allen's call and drove Allen and Valez a few blocks to the Manhattan North Precinct stationhouse, where they arrived at about 5:00 p.m. The squad car had been searched prior to Allen's call and had been found to be free of narcotics; however, when Valez got out of the car, Allen discovered ten packets of cocaine under Valez's seat. The police later searched Valez in the stationhouse and found an additional five packets of cocaine on him.

When Sergeant Zarr and the undercover officer who made the "buy" returned to the stationhouse, they realized that Allen had arrested the wrong man. The seller whom they had observed had been arrested at 48th and Ninth by other members of the field team at approximately 4:45 p.m., five minutes after Allen had arrested Valez. The real seller's name was Carlos Turiago.

After Valez was indicted on drug charges, he moved to suppress, as fruits of an illegal arrest, the 15 packets of cocaine found in his possession as well as his post-arrest statements that he intended to sell the cocaine. Valez argued that Allen did not have probable cause to arrest him because Allen could not have reasonably believed that Valez met Zarr's description of the seller. Valez relied primarily on the fact that Zarr's description did not include any mention of facial hair, whereas Valez had a small goatee and a thick moustache. Valez also argued that Zarr's description of the seller was overly general and that the mistaken arrest resulted from the negligent and unorganized conduct of the surveillance team.

After conducting an evidentiary hearing, Judge Owen denied Valez's motion to suppress in a Memorandum and Order filed June 26, 1985. The judge held that Zarr's silence on the matter of the seller's facial hair did not render Allen's arrest of the moustached Valez unreasonable, espe-

cially in light of the possibility that a beard or moustache may be worn as a disguise. The judge concluded that Zarr's description of the seller was adequately detailed and that Valez, who was in the immediate area of the drug transaction, sufficiently fit the description to give Allen probable cause to arrest Valez within the short space of time following the transaction. We agree.

*Hill v. California,* 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971), governs the law in cases where the person arrested turns out not to be the person sought. The Supreme Court held that the arrest is valid under the fourth amendment if the police have probable cause to arrest the person sought, and the arresting officer reasonably believed that the arrestee was that person. *Id.* at 802, 91 S.Ct. at 1110; *see also United States v. Glover,* 725 F.2d 120, 122 (D.C.Cir.1984). The rationale for the rule is clear: the deterrence function of the fourth amendment and the exclusionary rule is not served by invalidating a mistaken arrest or suppressing the fruits of such an arrest where the police acted in good faith and in a reasonable manner.

Both the government and Valez agree that, based on the personal observations of Sergeant Zarr and the undercover officer, the police had probable cause to arrest the actual drug seller, Turiago. The only question, therefore, is whether Officer Allen reasonably mistook Valez for Turiago. The reasonableness of Allen's conduct in this regard must be determined by considering the totality of the objective circumstances surrounding the arrest, including the adequacy of Zarr's description of the seller, the time and place of the arrest, and Allen's action in the period immediately following the arrest.

Valez's main contention is that it was unreasonable for Zarr to omit from his description that the seller was cleanshaven. Valez also contends that, in light of this omission, Allen should have questioned whether the moustached Valez was the man whom he was after. We disagree. Given Zarr's detailed description of the seller's clothing, his failure to mention that the

seller was cleanshaven does not constitute an unreasonable oversight. Nor do we believe that Allen should have inferred from Zarr's silence on this matter that the seller was in fact cleanshaven. For instance, Allen had no way of knowing whether Zarr's silence was purposeful or whether it meant that Zarr did not get a good look at the seller's face. Moreover, as the district judge noted, the police may justifiably place little reliance on the presence or absence of facial hair on a suspect who otherwise matches a description because facial hair may be worn or taken off as a disguise.

Valez argues next that Zarr created the likelihood of a mistaken arrest by (1) sending both Allen and the field team in search of the seller when they had no means to communicate with each other, and by (2) giving his officers a description of the seller which fit a number of people in the area. *See United States v. Rosario*, 543 F.2d 6, 8 (2d Cir.1976). These arguments are unpersuasive.

The police needed to respond quickly to the seller's disappearance from the street corner. It was not unreasonable for Zarr to order both Allen and the field team into pursuit to insure that the seller did not get away. We also believe that Zarr's description was sufficiently detailed to provide Allen with probable cause to believe that Valez was the seller, particularly because Allen encountered Valez, who matched every detail of the description,[1] within the immediate vicinity of the drug sale and not more than 10 minutes after Zarr gave Allen the description. Consideration of all these factors leads us to conclude that Allen reasonably mistook Valez for the seller. *Compare United States v. Fisher*, 702 F.2d 372, 376–77 (2d Cir.1983).

 Valez's third argument is that Allen acted improperly in taking Valez to the stationhouse instead of trying to verify, on the street, whether Valez was the seller.

We agree that where a police officer has or should have doubts whether a detained suspect is in fact the person sought, the officer must make "immediate reasonable efforts to confirm the suspect's identity." *Glover, supra*, 725 F.2d at 123. What is reasonable, however, depends on the circumstances surrounding the encounter. Here, Allen left the surveillance van in a hurry, in order to pursue the seller who had disappeared from Zarr's view. Because Zarr had the only radio in the van, Allen had no way to communicate with the field team. Alone with an apprehended suspect in a high crime area, Allen telephoned the police emergency number for assistance. A squad car responded and drove Allen and Valez a few blocks to the stationhouse where it was soon discovered that Valez was not the seller observed on the street corner. We believe that the stationhouse identification was reasonable in light of circumstances, not created by the police, which made street verification an inadvisable procedure and in light of the brief period of detention involved in taking the arrestee to the stationhouse.

Finally, Valez maintains that even if Allen had probable cause to believe that Valez was the seller, the subsequent arrest of the actual seller, Turiago, negated that probable cause and rendered Valez's arrest invalid. Valez's theory is that just as the factual predicate for probable cause to arrest may be premised on the collective knowledge of a police force and is not necessarily dependent on the personal knowledge of the arresting officer, so too, facts known to some members of the force that *negate* probable cause must be imputed to the arresting officer. Specifically, Valez maintains that Zarr's knowledge of Turiago's arrest at 4:45 p.m. thereupon nullified Allen's probable cause to believe that Valez was the seller. Valez concludes, therefore, that any evidence obtained from him after 4:45 p.m. was the fruit of an illegal arrest. We disagree.

We have seen exhibits from the suppression hearing consisting of "waist-up" photographs of Valez and Turiago shortly after their arrests. We note that their jackets and shirts were remarkably similar.

---

**1.** Valez is an Hispanic male who, at the time of his arrest, was 25 and was wearing a black leather jacket, a light grey V-neck shirt with dark trim on the collar, and grey pants with a comb in the back pocket.

As we have stated, the question in mistaken arrest cases is whether, given all the circumstances surrounding the arrest, the actions of the arresting officer were reasonable. Certainly, it would be relevant to the determination of reasonableness if the police had knowledge which, if communicated to the arresting officer, would have mitigated the possibility of mistake. Such knowledge, however, should not be "imputed" to the arresting officer in the manner Valez suggests.

The rule that permits courts to assess probable cause to arrest by looking at the collective knowledge of the police force—instead of simply looking at the knowledge of the arresting officer—should not affect the law of mistaken arrest. The rule exists because, in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superiors or associates. *See United States v. Canieso*, 470 F.2d 1224, 1230 n. 7 (2d Cir.1972). This rationale does not support Valez's view that facts known to some members of the police force which exonerate an arrestee are *ipso facto* imputed to the arresting officer. Rather, the issue is whether the failure to communicate these facts to the arresting officer rendered the mistaken arrest unreasonable.

In the present case, the police did not catch the true seller, Turiago, until shortly after Allen had arrested Valez and had placed him in a squad car. By the time Allen learned that Valez was not the seller, the packets of cocaine found under Valez's seat had already provided independent probable cause to support Valez's arrest. We decline to charge Officer Allen with constructive knowledge of Turiago's arrest.

We find that there was probable cause to arrest Valez. Thus, although Valez may be the victim of a mistake, no purpose would be served by suppressing clear evidence of Valez's guilt, which evidence came to the attention of the police as a result of their well-intentioned but misguided actions.

Affirmed.

OAKES, Circuit Judge (dissenting):

On federal Tuesday, October 16, 1984, the area of the West Forties between Eighth and Ninth Avenues was, at the time Valez was mistakenly arrested, "very busy with traffic and people," according to Sergeant Zarr's suppression hearing testimony. It contained, Sergeant Zarr admitted, "lots and lots of Latin people," with "twentiesh [sic] Latin males with black leather-type jackets and gray pants," a "not uncommon" element of the street population. *Compare United States v. Shavers*, 524 F.2d 1094, 1095 (8th Cir.1975) (no probable cause because "[a]t 9 o'clock on any weekday morning, many individuals answering to the broadcast description could be found in a business district such as the one where Shavers was arrested").

By sending an officer into the area with a description only of race, approximate age, and clothing and, oh yes, of a comb in the hip pocket—but not mentioning facial hair or its absence, or the length of the suspect's haircut—Zarr was insufficiently distinguishing the person who made the sale from other Latin males of "not uncommon" appearance in the immediate area. It was the equivalent of "identifying" a suspect in the Wall Street area by describing him as a white, thirty-ish man with a button-down shirt and dark pinstripe suit, carrying a leather attache case. In the Wall Street case, as in this case, it would hardly be surprising if the victim of a mistaken arrest matched the description in all its elements and was wearing clothes "remarkably similar" to those of the suspect.

Of course, it is not surprising that Zarr's description was cast in general terms. Zarr was observing a milling group of individuals, whose numbers, he said, ranged from "three to five, and at sometimes [sic] six or seven" congregating at the corner of Forty-Eighth Street and Ninth Avenue; he was 200 feet from that corner, his view was partially obstructed, and his binoculars were only seven-power. Zarr's testimony at trial shows that, under these circumstances, he did not provide a detailed description of the suspect because he was

unable to do so. Zarr acknowledged that from his vantage point he could not tell whether the suspect was actually Hispanic; the policeman could only tell that the individual selling narcotics was not black, and the description of him as Hispanic was an educated guess based on the neighborhood. Zarr also admitted that, from where he was watching, he could not tell whether the person he was studying had any facial hair, and he could not determine facial features. In any event, the description he provided did not include elements that in the context of that particular time and neighborhood a description of Turiago should have contained, and those omissions made the mistaken arrest possible. Zarr failed to note that Turiago had a short haircut (Valez had hair well below his ears) and was clean-shaven (Valez had a thick moustache and, I would say, not so small a goatee).

In directing that an arrest be made pursuant to a description that likely fit a number of people in the area, Sergeant Zarr failed to demonstrate the proper amount of prudence. In arresting Valez, Officer Allen was also not acting prudently. Zarr's description had specifically referred to "a whitish shirt with a V-neck collar with dark trim," a description fitting the actual suspect Turiago but, at least in my observation, not Valez, since the latter's V-neck shirt had neither a collar nor dark trim around the neckline, as demonstrated by the photographs of each taken on arrest. I view the photo of Valez as merely showing a sidelight shadow on the neckline trim, a shadow consistent with other folds in the shirt.[1]

Here under the totality of circumstances it was unreasonable to arrest Valez on the belief that he was Turiago. *United States v. Fisher*, 702 F.2d 372, 376–77 (2d Cir. 1983); *see Hill v. California*, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971). The "disguise" suggestion in the majority opinion, i.e., that a clean-shaven person might

have put on a goatee and moustache (and, since Zarr's description failed to mention hair length, the majority presumably should also have argued that a person with a short haircut might have put on a wig), rings hollow not only in light of the short lapse of time involved but the place—Blimpie's—where any such disguise might have been put on. This case is stronger for the defendant than *Fisher*, for it is not even suggested that anything Valez himself did other than to be around the corner from the drug-sale scene furnished Officer Allen with any cause for the arrest.

The majority opinion seems to me to contain factual error in the case of the shirt trim, and it makes a crucial omission in failing to consider Zarr's not mentioning the suspect's haircut. Even if these issues are ignored, that opinion still merits rejection because it is in disregard of our precedent, *Fisher* (which the majority cites with a "compare"), and contrary to the Eighth's Circuit's compelling opinion in *Shavers*. For these reasons, I respectfully dissent.

---

1. There is in the record a mug shot taken the day after Valez's arrest at the United States Marshal's office showing him wearing a gray sweatshirt with red trim around the neckline, most of which is obscured by the identity sign he is holding. To me that does not appear to be the same shirt he was wearing in the photo taken at the police station on his arrest. But even if I am wrong, Sergeant Zarr's insufficient description would require reversal in my opinion.