# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
             *Plaintiff-Appellee,*

v.

DOUGLAS JENSEN,
             *Defendant-Appellant.*

No. 04-30094

D.C. No.
CR-03-27-M-DWM

OPINION

Appeal from the United States District Court
for the District of Montana
Donald W. Molloy, District Judge, Presiding

Argued and Submitted
February 8, 2005—San Francisco, California

Filed October 6, 2005

Before: Diarmuid F. O'Scannlain, M. Margaret McKeown,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge Bea

13841

**COUNSEL**

Bryan Charles Tipp, Tipp & Buley, Missoula, Montana, for the defendant-appellant.

Joseph E. Thaggard, Assistant United States Attorney, Great Falls, Montana, for the plaintiff-appellee.

**OPINION**

BEA, Circuit Judge:

It was an excess of speed that initially brought him to the attention of authorities, but bad news eventually caught up with Defendant-Appellant Douglas Jensen ("Jensen"). Jensen

was convicted for possession of methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and sentenced to life imprisonment without parole under 21 U.S.C. § 841(b)(1)(A) and 21 U.S.C. § 851(a)(1). On appeal, Jensen contends that the district court erred in denying his motion under Fed. R. Crim. P. 12(b)(3) to suppress the evidence seized from his vehicle and residence on the grounds that his arrest and the seizure of his vehicle were executed without probable cause and, accordingly, all of the evidence in the case was seized in violation of the Fourth Amendment.

Jensen also appeals his sentence on the ground that the sentencing scheme under which he was sentenced, 21 U.S.C. § 841(b)(1)(A) and 21 U.S.C. § 851(a)(1), is unconstitutional insofar as it violates: (1) the constitutional separation of powers and non-delegation doctrines; (2) Jensen's due process rights; and (3) the Eighth Amendment's prohibition on cruel and unusual punishment.

We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm Jensen's conviction and sentence.

## I.  BACKGROUND

### A.  Report of Jensen's Reckless Driving

At approximately 8:00 a.m. on February 19, 2003, a private citizen saw a black 1987 Ford Taurus station wagon traveling in excess of 75 miles per hour driving northbound on Highway 93 in Flathead County, Montana. The speed limit in the area was 25 miles per hour. The citizen called 911 and reported that the vehicle was traveling at a high rate of speed and "weaving in and out of traffic" in a reckless manner. He provided the dispatcher with a description of the car and the license number of the vehicle.

Thereafter, the Flathead County Sheriff's Department issued an "attempt to locate" dispatch for a reckless, possibly

drunk driver, reported by a concerned citizen, and that dispatch was received by the police department in Kalispell. An "additional attempt to locate" was later issued and broadcast, which described the car more specifically as a black 1987 Ford Taurus and provided the license plate number.

At approximately 8:30 a.m., Sergeant Lonnie Eugene Cook of the Whitefish Police Department driving south on Highway 93, heard both the original "attempt to locate" dispatch and the additional "attempt to locate" dispatch.

**B.   Arresting Officer's Information Regarding Jensen's Drug Activities**

Sergeant Cook had served on the Northwest Drug Task Force ("Task Force") from September 2000 to January 2003. During that time, he was also cross-deputized as a Flathead County Deputy Sheriff. In January 2003, Cook returned to service as a sergeant on the Whitefish Police Department, and was replaced on the Task Force by another Whitefish police officer, Detective Michael Meehan. While on the Task Force, Cook had received intelligence on Jensen's drug-running activities which included a description of Jensen's car: A black Ford Taurus station wagon.

On the basis of knowledge obtained during his time on the Task Force, Cook suspected that Jensen was the driver of the vehicle. Cook then called the Flathead County Sheriff's Department to confirm his suspicion that Jensen was the driver of the vehicle. After receiving confirmation from the Sheriff's Department that the car was Jensen's, Cook continued driving south on Highway 93 with the intention of intercepting the speeding vehicle. At that point, Cook heard on his police radio Flathead County Deputy Tykachk say that the vehicle was going north at a "high rate of speed" and that Tykachk "could not get in behind it" or catch up due to the vehicle's speed. Cook continued south along Highway 93.

## C. Traffic Stop

At approximately 9:00 a.m., Cook caught up with Jensen as Jensen's vehicle made a westbound turn onto Blanchard Lake Road. Sergeant Cook stopped Jensen's car, asked to see Jensen's driver's license, and proceeded to question Jensen. A short time later, Deputy Tykachk and Flathead County Corporal Phil Meredith arrived.

Corporal Meredith began to conduct an investigation and field sobriety test. Based on the information he obtained, Corporal Meredith concluded that Jensen was not intoxicated but indicated he would cite Jensen for careless driving.

## D. Arrest and Impoundment of Jensen's Vehicle

From his three years of experience as a member of the Task Force, Cook knew that the Task Force had been interested in Jensen. Cook called Task Force Detective Michael Meehan and informed Meehan that Jensen was the subject of a traffic stop. Cook then asked whether the Task Force "ha[d] any ongoing investigations" or was "looking at [Jensen] for anything" to which Detective Meehan responded, "Oh, I didn't know he was back from Mexico." Shortly thereafter, Meehan arrived at the scene of the traffic stop.

Cook called Officer Zimmerman, a senior officer on duty at the Kalispell Police Department, and inquired whether the Kalispell Police Department wished to cite Jensen for careless driving or take him into custody. Officer Zimmerman gave Cook clearance to arrest Jensen. Cook arrested Jensen and ordered Jensen's vehicle impounded. Cook then took Jensen to the impound lot, where they met Detective Meehan. After Jensen refused to consent to a search of his automobile, a police department K-9 unit drug-sniffing dog was used to check the vehicle. The dog alerted police to the presence of narcotics. Cook then transferred Jensen to the custody of the Kalispell Police Department.

As a result of the dog's indicating the presence of narcotics in Jensen's vehicle, Detective Meehan applied to a district court judge for a search warrant to search Jensen's vehicle for evidence related to the criminal possession of illegal drugs. In addition to describing the results of the canine alert, the sworn application included the statement that Jensen "is known to Meehan and other members of the [Northwest Drug Task Force] of being involved in the sale and trafficking of methamphetamine." The application also stated:

> Meehan has received recent information on or about January 21, 2003 from an informant who has been proven reliable by the NWDTF. The informant advised that Jensen was currently making a trip to the Nevada California [sic] area to pick up a large quantity of methamphetamine. The informant advised that Jensen was using his black Ford station wagon to haul methamphetamine back to Montana. The same informant advised that he knew Jensen to package methamphetamine in coffee to mask the odor. The packages were hidden inside and under the station wagon and on one occasion, the informant helped Jensen unpack a large load of methamphetamine.

In the application, Meehan also reported on information received by another member of the Task Force, Detective McCarvel. According to the application, Detective McCarvel was told in December 2002 by a citizen source "very familiar with Jensen and Jensen's drug activity" that Jensen distributed methamphetamine, and regularly traveled to California to acquire methamphetamine, on one occasion in the company of the citizen source. The citizen source told McCarvel that "Jensen had previously been arrested in another state, when he was transporting drugs on one of these trips," "frequently concealed large quantities of methamphetamine in . . . a tool box in the bed of a pickup or a lockbox underneath the seat of the vehicle," and "commonly stored the methamphetamine

in plastic containers and used cayenne pepper to help mask the odor of methamphetamine."

The search warrant application also contained information regarding McCarvel's work with another confidential informant in January of 2003. The confidential informant was reliable, according to the application, because the informant had "provided accurate, reliable information that was corroborated . . . made statements against their [sic] self interest and performed two successful controlled drug transactions." The confidential informant also claimed familiarity with Jensen's drug activities, had purchased methamphetamine from Jensen, and knew Jensen was traveling to southern California to purchase large quantities of methamphetamine for sale in Montana's Flathead Valley.

The confidential informant reportedly told McCarvel that "Jensen frequently concealed the methamphetamine in body panels or in hidden compartments, on the vehicle that he drove to California . . . frequently attempted to mask the methamphetamine with either coffee or pepper . . . [and] usually made these trips to California approximately once every four weeks." According to McCarvel's informant, "Jensen was getting ready to leave to California (approximately the second week of January 2003), and that Jensen would be taking a 1987 Ford Taurus station wagon, black in color."

Later that same day, the county court issued a search warrant authorizing the search of the vehicle.

Detective Meehan searched the vehicle and found three Tupperware containers wrapped in black tape inside the frame under the vehicle. The containers had magnets glued to the inside and contained a crystalline substance mixed with pepper. In one container was 156.5 grams of a mixture of methamphetamine and cayenne pepper. In the second container was 206.1 grams of pure methamphetamine (and an additional 106.2 grams of powder). In the third container was

419.7 grams of powder, 54.66 grams of which was pure methamphetamine.

### E.   Search of Jensen's Residence

Upon finding the methamphetamine in Jensen's vehicle, on February 20, 2003, Detective Meehan applied to the Flathead County district court for a search warrant for Jensen's residence. The warrant contained substantially the same information contained in Meehan's application for a warrant to search Jensen's car, as well as a description of what that search had produced. The state court issued the search warrant, which was executed by officers the next day. In Jensen's home, officers located a briefcase, a Tupperware container, a digital scale, and bags with crystal-like substance and a small amount of marijuana. Inside a desk found in the residence, officers found a large number of sandwich bags, a scale and a marijuana pipe.

## II.   PROCEDURAL BACKGROUND

### A.   Motion to Suppress

After Jensen was indicted, he moved to suppress the evidence seized from his vehicle and residence on the grounds that his arrest for reckless driving, and the seizure of his vehicle were all conducted without probable cause and, accordingly, the evidence was seized in violation of the Fourth Amendment.

The district court denied Jensen's motion to suppress.

### B.   Bench Trial and Verdict

Having waived his right to a jury trial, Jensen was tried in a bench trial. That same day, the district court judge found Jensen guilty of possession of methamphetamine with intent to distribute 50 grams.

### C.   Sentencing Hearing and Sentence

At the sentencing hearing, the district court judge adopted the recommendation of the Presentence Report. He found that, under the Sentencing Guidelines, Jensen's base offense level was 34. See U.S.S.G. § 2D1.1(a)(3), (c)(3) (providing that possession of between 150 but less than 500 grams of methamphetamine warrants a base offense level of 34). Jensen's sentencing guideline range with a 34 base offense level would have been 210-260 months' imprisonment.

Here, however, Jensen had two prior felony convictions. Following the statute, the district court sentenced Jensen to life imprisonment and ten years supervised release under 21 U.S.C. § 841(b)(1)(A) and 21 U.S.C. § 851(a)(1).

## III.   PROBABLE CAUSE

Jensen argues that the district court erred in denying his motion to suppress evidence seized from his vehicle and residence.[1] We review *de novo* a district court's denial of a motion to suppress as to issues of law. *United States v. Jones*, 286 F.3d 1146, 1150 (9th Cir. 2002). We review the district court's findings of fact in denying a motion to suppress for clear error. *Id.*

[1] The Fourth Amendment requires that a law enforcement officer have "probable cause" to arrest an individual without a warrant. *See United States v. Hoyos*, 892 F.2d 1387, 1392 (9th Cir. 1989), *overruled on other grounds by United States v. Ruiz,* 257 F.3d 1030, 1032 (9th Cir. 2001). The test for whether probable cause exists is whether "at the moment of arrest the facts and circumstances within the knowledge of the

---

[1]We agree with the district court that the law enforcement officers had "reasonable suspicion" for the initial traffic stop. *See Alabama v. White*, 496 U.S. 325, 328 (1990) (requiring "reasonable suspicion" of criminal wrongdoing before conducting an investigatory traffic stop).

arresting officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *United States v. Bernard*, 623 F.2d 551, 559 (1980) (internal quotation and citations omitted). A determination as to whether probable cause exists requires a "practical, common-sense" decision based on the totality of the circumstances, including the veracity, basis of knowledge and reliability of the information provided by informants. *See Illinois v. Gates*, 462 U.S. 213, 214 (1983).

## A.   Drug Activity

We conclude that Cook had probable cause to arrest Jensen on suspicion of illegal drug activity. Sergeant Cook testified that, while a member of the Task Force, he had received intelligence regarding Jensen's activities. Jensen argues that Cook's failure precisely to specify what intelligence he had received renders his testimony ineffective to support a finding of probable cause. We disagree.

### 1.   *Collective Knowledge Doctrine*

[2] Sergeant Cook's testimony that he had received intelligence regarding Jensen was sufficient for the purpose of establishing probable cause under the so-called "collective knowledge doctrine." The accepted practice of modern law enforcement is that an officer often makes arrests at the direction of another law enforcement officer even though the arresting officer himself lacks actual, personal knowledge of the facts supporting probable cause. *United States v. Butler*, 74 F.3d 916, 921 (9th Cir. 1996); *see also United States v. Hensely*, 469 U.S. 221 (1985) (police officers entitled to rely on radio bulletins based on reasonable suspicion of other officers). In such situations, a probable cause determination is based on the collective knowledge of the law enforcement personnel.

"[W]here law enforcement authorities are cooperating in an investigation [ ], the knowledge of one is presumed shared by all." *Illinois v. Andreas*, 463 U.S. 765, 772 n.5 (1983). "The rule exists because, in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superior or associates." *United States v. Valez*, 796 F.2d 24, 28 (2d Cir. 1986).

We elaborated on this doctrine in *United States v. Bernard*, 623 F.2d 551 (9th Cir. 1980). There, the defendants were charged with conspiracy to manufacture methamphetamine in violation of 21 U.S.C. §§ 812, 841(a)(1) and 846. *Id.* at 560. The district court granted the defendant's motion to suppress, and the government appealed. *Id.* at 560. We reversed, holding that the collective knowledge of all of the agents involved in the investigation and surveillance manufacturing methamphetamine was sufficient to constitute probable cause. *Id.* at 560 (internal citation omitted). "In effect all of them participated in the decision to make the arrests . . . [One officer] was entitled to rely on the observations and knowledge of [the others], even though some of the critical information had not been communicated to him." *Id.* at 560-61.

Similarly, in *Hoyos*, 892 F.2d at 1387, this court again held that "the arresting officer need not have personal knowledge of the facts sufficient to constitute probable cause" and "need not be aware of all the facts and circumstances known to the other officers participating in the arrest." *Id.* at 1392. Rather "probable cause may be based on the collective knowledge of all the officers involved in the investigation and all of the reasonable inferences that may be drawn therefrom." *Id.*

y3Under *Bernard* and *Hoyos*, then, "when there has been communication among agents, probable cause can rest upon the investigating agents' 'collective knowledge.' " *United States v. Del Vizo*, 918 F.2d 821, 826 (9th Cir. 1990) (citing

*Bernard*)); *see also United States v. Sandoval-Venegas*, 292 F.3d 1101, 1105-1106 (9th Cir. 2002).

## 2. *Information Known By Individual Agents Here*

Here, considering all of the circumstances, we conclude that the record clearly establishes that Sergeant Cook and members of the Task Force had extensive and specific knowledge of Jensen's drug-related activities.

### a. *Information Known By Detective Meehan*

Detective Meehan became involved in the stop of Jensen when Sergeant Cook called him and asked whether the Task Force was "looking at [Jensen] for anything." Meehan then drove to the scene of the stop to consult with Cook and was present at the time of Jensen's arrest. The record indicates that, prior to the time of the arrest, Meehan had been told by an informant on or around January 21, 2003 that "Jensen was currently making a trip to the Nevada California area to pick up a large quantity of methamphetamine."

In addition, Meehan learned from the informant that Jensen was using his black Ford station wagon, the car he was driving when he was stopped by Officer Cook. Meehan's informant told of assisting Jensen in procuring a large quantity of methamphetamine, related in detail Jensen's method for packaging the drug to avoid detection, and described where Jensen secreted containers of methamphetamine in the station wagon.

### b. *Information Known By Detective McCarvel*

At the time of Jensen's arrest, another member of the Task Force, Detective McCarvel, possessed extensive information regarding Jensen's activities, information he had shared with Detective Meehan. The record reflects that McCarvel had learned from a citizen source that Jensen regularly went to

California to purchase methamphetamine, "frequently conceal[ing] large quantities of methamphetamine in his vehicle."

    c.   *Information Known By Sergeant Cook*

During the suppression hearing, Cook testified that while working on the Task Force, he had received intelligence on Jensen. In particular, Cook testified that: "I had prior intelligence from the Northwest — working on the Northwest Drug Task Force that Mr. Jensen may be involved in some other things." Cook and Meehan—his replacement on the Task Force—worked in close contact during the arrest. Cook called Meehan after Jensen had been stopped. After stating, "I didn't know he was back from Mexico," Meehan immediately proceeded to the scene of the traffic stop.

**[4]** It is clear that the facts and circumstances within the knowledge of Sergeant Cook and Detective Meehan, and of which they had reasonably trustworthy information, were sufficient to support a belief that Jensen had committed a narcotics offense. The record indicates that the totality of the circumstances at the time Cook arrested Jensen included intelligence gathered by Cook during his service on the Task Force, as well as the information contained in the sworn warrant application submitted by Meehan. Accordingly, Jensen's arrest was supported by probable cause. *See Butler*, 74 F.3d at 921.

**B.   Impoundment of Jensen's Vehicle**

**[5]** Based on the evidence supporting Jensen's arrest, as well as the results of the canine sniff test,[2] impoundment of Jensen's vehicle was proper under the Fourth Amendment, because Cook had probable cause to believe the vehicle con-

---

[2]We also note that such use of a narcotics-detection dog does not itself constitute a search so as to implicate Fourth Amendment concerns. *See Illinois v. Caballes*, 125 S.Ct. 834, 838 (2005).

tained illegal drugs. *See United States v. Ibarra*, 345 F.3d 711, 715 (9th Cir. 2003).

Cook also had the authority to impound Jensen's vehicle under the "community caretaker doctrine." Once the arrest was made, the doctrine allowed law enforcement officers to seize and remove any vehicle which may impede traffic, threaten public safety, or be subject to vandalism. *See Hallstrom v. City of Garden City*, 991 F.2d 1473, 1477 n. 4 (9th Cir. 1992); *see also Cady v. Dombrowski*, 413 U.S. 433, 441 (1973).

The district court specifically found that Jensen's vehicle was parked in the road "such that it was reasonable for Sgt. Cook to impound it to remove the obstruction to traffic." Moreover, the district court found that "Sgt. Cook's concerns about vandalism were reasonable." The district court did not clearly err in making these findings.

**[6]** Accordingly, we affirm the district court's decision to deny Jensen's motion to suppress.

## IV. SENTENCING

Jensen also argues that the sentencing penalty provided under 21 U.S.C. § 841(b)(1)(A) and 21 U.S.C. § 851(a)(1) is unconstitutional in that it: (1) violates the separation of powers and non-delegation doctrines; (2) violates Jensen's due process rights; and (3) subjects Jensen to cruel and unusual punishment in violation of the Eighth Amendment. We review the constitutionality of a statute *de novo*. *See United States v. Stokes*, 292 F.3d 964, 966 (9th Cir. 2002), and we affirm.

The statutory scheme at issue here, Section 841(b)(1)(A), provides for the possibility of life imprisonment for any person who violates the statute where such person has two prior convictions for a felony drug offense. *See* 21 U.S.C.

§ 841(b)(1)(A)(viii). Under Section 851, increases in sentence based upon prior felony drug convictions may not be imposed unless the United States Attorney first files a written information stating the prior convictions to be relied upon. *See* 21 U.S.C. § 851(a)(1). A defendant may challenge the use of any of the prior convictions that occurred within the last five years. *See* 21 U.S.C. § 851(b)-(c) & (e). Once the Government files the information, the sentencing court is then required to impose the enhanced sentence "if the court determines, after hearing, that the person is subject to increased punishment by reason of two prior convictions." 21 U.S.C. § 851(d)(1).

## A.   Separation of Powers

First, Jensen contends that the sentencing scheme violates the separation of powers doctrine under Article I of the Constitution insofar as the Sentencing Guidelines "no longer apply" once a Section 851(a)(1) information is filed, and thus any discretion with respect to sentence is vested in the executive—rather than judicial—branch. According to Jensen, this impermissibly infringes on the ability of the district court to impose a sentence of less than life imprisonment.

**[7]** This argument is foreclosed by the Supreme Court's decision in *United States v. LaBonte*, 520 U.S. 751 (1997). There, the Court rejected an argument that prosecutorial discretion under Section 851 resulted in unconstitutional disparity in sentencing, observing that the discretion available to prosecutors under Section 851 is "similar to the discretion a prosecutor exercises when he decides what, if any, charges to bring against a criminal suspect," and holding that such discretion is constitutional. *Id.* at 762.

**[8]** Jensen also argues that Section 851 violates the non-delegation doctrine inasmuch as it delegates to the executive branch the legislative power and discretion to sentence defendants under the sentencing provisions of Section 841. Jen-

sen's argument is unavailing. Under the Supreme Court's decision in *United States v. Mistretta*, 488 U.S. 361, 371 (1989), delegation is permissible so long as there are "intelligible principles" by which to exercise the delegated authority.

**[9]** While this court has not directly addressed the question whether the sentencing scheme at issue here violates the non-delegation doctrine, two circuits have concluded that the sentencing scheme does not impermissibly delegate legislative authority to the executive. *See*, *e.g.*, *United States v. Crayton*, 357 F.3d 560, 571-72 (6th Cir. 2004) (holding that 21 U.S.C. § 851 does not violate the non-delegation doctrine); *United States v. Cespedes*, 151 F.3d 1329, 1333 n.1 (11th Cir. 1999) (holding that Section 851 does not constitute a delegation of legislative power and concluding that "even if the sentence enhancement provisions of § 851 were characterized as a delegation of legislative power, we would find that Congress had provided altogether intelligible principles to render the delegation constitutional"). We find this reasoning persuasive and similarly reject Jensen's separation of powers claim.

## B.  Due Process

**[10]** Jensen argues that the sentencing scheme violates his due process rights under the Fourteenth Amendment insofar as it vests all discretion in the Attorney General and the United States Attorney and confers no discretion on the sentencing judge. This argument is foreclosed by our decision in *United States v. Van Winrow,* 951 F.2d 1069 (9th Cir. 1991), where we rejected the argument that the imposition of a life sentence for three prior drug convictions under 21 U.S.C. § 841(b)(1)(A) violates due process by depriving the trial judge of discretion to impose sentence. We held that such sentences are "individualized according to quantity and variety of narcotic possession" and "according to the number of prior felony drug convictions," and thereby comport with due process. *Id.* at 1071.

## C.   Eighth Amendment

**[11]** Finally, Jensen argues that the sentencing scheme imposed a sentence that was not "proportional" to the crime, thereby subjecting him to cruel and unusual punishment in violation of the Eighth Amendment. This argument is foreclosed by the Supreme Court's decision in *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (affirming Michigan court's imposition of a life sentence for a first time conviction for drug possession holding that such sentence does not violate the Eighth Amendment); *see also United States v. Van Winrow*, 951 F.2d 1069, 1071 (9th Cir. 1991) (rejecting defendant's argument that the imposition of a life sentence for three prior drug convictions under 21 U.S.C. § 841(b)(1)(A) was cruel and unusual in violation of the Eighth Amendment).

## V.   CONCLUSION

We conclude that Sergeant Cook had probable cause to arrest Jensen for suspicion of drug trafficking under the collective knowledge doctrine. We therefore affirm the district court's denial of Jensen's motion to suppress the evidence seized from his vehicle and residence.

Moreover, we reject Jensen's arguments regarding the constitutionality of the statutory scheme under which he was sentenced, 21 U.S.C. § 841 and 21 U.S.C. § 851. Accordingly, we affirm the district court's sentence of life imprisonment without parole.

**AFFIRMED.**